Adkins, J.
Child custody and visitation decisions are among the most serious and complex decisions a court must make, with grave implications for all parties. The dissolution of a non-traditional marriage just compounds the difficulties of this already challenging inquiry. This appeal arises out of a divorce between a lesbian couple, and involves a dispute over one spouse’s right of access to a child conceived by artificial insemination and born before the couple was married. Petitioner calls upon us to revisit the concept of de facto parenthood and our previous *55 decision in Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008).
FACTS AND LEGAL PROCEEDINGS
Michelle[1] and Brittany Conover began a relationship in July 2002. The parties discussed having a child and agreed that Brittany would be artificially inseminated from an anonymous donor arranged through the Shady Grove Fertility Clinic. The child was conceived in 2009. The couple gave birth to a son, Jaxon William Lee Eckel Conover (“Jaxon”), in April 2010. The birth certificate listed Brittany as Jaxon’s mother, but no one was identified as the father. The parties married in the District of Columbia in September 2010 when Jaxon was about six months old.
In September 2011, Michelle and Brittany separated. From the date of separation until July 2012, Michelle visited Jaxon and had overnight and weekend access. At some point in July 2012, Brittany prevented Michelle from continuing to visit Jaxon. In February 2013, Brittany filed a Complaint for Absolute Divorce, stating that there were no children shared by the couple from the marriage. Michelle filed an Answer later that month in which she requested visitation rights with respect to Jaxon. In March 2013, Michelle filed a Counter-Complaint for Absolute Divorce, in which she repeated her request for visitation rights. Michelle did not request custody.
In April 2013, the parties appeared at a hearing in the Circuit Court for Washington County to determine Michelle’s standing to seek access to Jaxon. Brittany, appearing pro se, argued that Michelle did not have parental standing because she was not listed on the birth certificate as a parent of Jaxon, *56 and that as a third party, she could not assert visitation rights. Michelle asserted that she had standing because she met the paternity factors for a “father” set forth in Md. Code (1974, 2011 Repl. Vol.), Estates & Trusts (“ET”), § l-208(b).[2] At the hearing, Michelle’s counsel averred that there were “constitutional reasons” that supported this interpretation, but provided no further explanation. The Circuit Court requested supplemental memoranda. Michelle filed a legal memorandum in which no constitutional contentions were made. Brittany did not submit a memorandum.
The Circuit Court then conducted an evidentiary hearing and took testimony from Michelle and Brittany. The following pieces of evidence were elicited at the hearing:
• Michelle helped choose an anonymous sperm donor with characteristics similar to her own;
• Brittany took on the more “female” role in the relationship, while Michelle took on the more “masculine” role;
• Although Brittany later objected to the practice, Jaxon, at times, called Michelle “Dada” or “Daddy”;
• Brittany sometimes referred to Michelle as Jaxon’s father;
• A document, dated July 16, 2010, written entirely in Brittany’s handwriting was introduced. It stated that both parties “verified” that they agreed to “joint custody” *57 of Jaxon with “[t]he exact terms of which to be determined at a later date”;[3]
• Michelle testified that the parties considered initiating a proceeding for Michelle to adopt Jaxon, but they could not afford the cost.
At the conclusion of the evidentiary portion of the proceeding, Michelle’s counsel contended that parental standing existed under ET § l-208(b). She also argued that Brittany was estopped to deny that Michelle was the child’s father. Finally, she stated:
An alternative argument is that my client has standing for custody based on extra .., extraordinary circumstances. And ... and I’m not sure if you want me to go into that argument or not. Ah, but for a custody proceeding, a Court can consider custody to a third party or visitation to a third party if the Court finds that there are extraordinary circumstances. And I believe that this case screams extraordinary circumstances.
In June 2018, the Circuit Court issued a written opinion concluding that Michelle did not have standing to contest custody or visitation. First, the court found that Michelle did not have parental standing. The court took note of the common law and statutory presumption that a child born during a marriage is presumed to be the child of both spouses, but concluded that the presumption was not applicable here as Jaxon was conceived and born prior to Brittany and Michelle’s marriage. The court also found Michelle did not establish parental standing under ET § 1—208(b) because she was not Jaxon’s “father.” The court explained:
Although it is certainly a creative argument, the statute is intended for children to claim parentage and rights to property after a parent has deceased, not for the parent to claim the child under it. Moreover, this Court finds that *58 even under its broadest interpretation, the statute’s application was intended by the [Ljegislature to be applied in instances of child support, not to establish standing for visitation and custody of a child. See Md. Code Ann., Fam. Law § 5-1005(a). [Michelle] argues that although not a male, she has sufficiently satisfied three of the four criteria under [ET] § l-208(b) to qualify as the minor child’s father. [Section] l-208(b) specifically pertains to the parentage of an illegitimate child claiming his or her “father[,]” which [Michelle] in this case is not. During the hearing the parties testified to the fact that [Michelle] is in fact a female, had not adopted the child, and in no way was related to the child, thus not sufficiently establishing that she could be the “father” of the child.
Although the Circuit Court stated that Michelle was Jaxon’s defacto parent, it relied on Janice M. v. Margaret K., 404 Md. 661, 948 A.2d 73 (2008) in concluding that de facto parent status was not recognized in Maryland.
Next, the court found that Michelle did not have “third party” standing to contest custody or visitation. Relying on Janice M., the court held that Michelle, as a “third party,” had to show that Brittany was unfit or that exceptional circumstances existed to overcome the biological mother’s constitutionally protected interest in the care and control of her child. Based on the testimony at the hearing, the court found Brittany to be a fit parent and that “[t]here [had] been no showing of exceptional circumstances.” The Circuit Court denied Michelle’s request for custody or visitation based on lack of standing.
After the divorce was granted, Michelle timely appealed the Circuit Court’s order on visitation to the Court of Special Appeals. The Court of Special Appeals affirmed in a reported decision. Conover v. Conover, 224 Md.App. 366, 120 A.3d 874 (2015). First, the intermediate appellate court considered it inappropriate to address the issue of whether ET § l-208(b) must be read to include women. Id. at 376, 120 A.3d 874. The court noted that whether the Fourteenth Amendment of the United States Constitution or the Equal Rights Amendment of *59 the Maryland Declaration of Rights necessitate that the term “father” in ET § l-208(b) be given a gender-neutral construction was an issue that was neither raised nor decided below. Id. Next, the court ruled that even if Michelle qualified as a “father” under ET § l-208(b) despite her being female, the statute did not establish parentage for purposes of child custody and visitation:
A non-biological, non-adoptive spouse who meets one, two or even three tests under ET § 1—208(b) is still a “third party” for child access purposes. Under Janice M., he or she is not a “legal parent” — He or she must still show exceptional circumstances to obtain access to a child over the objection of a fit biological parent and to overcome the natural parent’s due process rights.
Id. at 380, 120 A.3d 874.
We granted Michelle’s Petition for Writ of Certiorari presenting the following two questions for review:
(1) Should Maryland reconsider Janice M. v. Margaret K. and recognize the doctrine of defacto parenthood?
(2) Did the Court of Special Appeals err in holding that Michelle is a “third party,” where Michelle is a legal parent under ET § 1—208(b)?
We hold that de facto parenthood is a viable means to establish standing to contest custody or visitation and thus answer yes to the first question. We shall reverse the judgment of the Court of Special Appeals. Because we overturn Janice M. and recognize de facto parent status, we need not address Michelle’s arguments regarding ET § 1-208 and thus do not answer the second question.[4]
*60 STANDARD OF REVIEW
Brittany and Michelle agree that the facts in this ease are not in dispute. Whether we should reconsider Janice M. and recognize the doctrine of de facto parenthood is a legal question, and so we review the Circuit Court’s decision without deference. Elderkin v. Carroll, 403 Md. 343, 353, 941 A.2d 1127 (2008) (“When the ruling of a trial court requires the interpretation and application of Maryland case law, we give no deference to its conclusions of law.”),
DISCUSSION
The primary goal of access determinations in Maryland is to serve the best interests of the child. Taylor v. Taylor, 306 Md. 290, 303, 508 A.2d 964 (1986) (“We emphasize that in any child custody case, the paramount concern is the best interest of the child .... The best interest of the child is [ ] not considered as one of many factors, but as the objective to which virtually all other factors speak.”); Ross v. Hoffman, 280 Md. 172, 174-75, 372 A.2d 582 (1977) (asserting that the “best interest standard is firmly entrenched in Maryland and is deemed to be of transcendent importance”). It is also well-established that the rights of parents to direct and govern the care, custody, and control of their children is a fundamental right protected by the Fourteenth Amendment of the United States Constitution. Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); see Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Although there is some tension inherent amongst these two deep-rooted principles, we recognized in McDermott v. Dougherty, 385 Md. 320, 353, 869 A.2d 751 (2005), that the rights of parents to custody of their children are generally superior to those of anyone else:
Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing in respect to rights to “care, custody, and control” of the children. The parent is asserting a fundamental constitutional right. The third party is not.
*61 We have thus held that a third party seeking custody or visitation must first show unfitness of the natural parents or that extraordinary circumstances exist before a trial court could apply the best interests of the child standard. McDermott, 385 Md. at 325, 869 A.2d 751; see Koshko v. Haining, 398 Md. 404, 445, 921 A.2d 171 (2007) (ruling grandparent visitation statute unconstitutional as-applied where no threshold finding was made regarding whether parents were unfit or whether exceptional circumstances existed).

Janice M. v. Margaret K.

In Janice M., 404 Md. at 671, 948 A.2d 73, we considered whether Maryland recognized de facto parenthood and if so, whether a de facto parent seeking custody or visitation had to show parental unfitness or exceptional circumstances before a trial court could apply the best interests of the child standard. In so holding, we overruled the Court of Special Appeals decision treating defacto parental status as sufficient to confer standing to seek visitation in S.F. v. M.D., 132 Md.App. 99, 751 A.2d 9 (2000). Janice M., 404 Md. at 683-85, 948 A.2d 73. That court held that a de facto parent seeking visitation need not prove the unfitness of the biological parents or exceptional circumstances as a prerequisite to a best interests of the child analysis. 132 Md.App. at 111-12, 751 A.2d 9.
In revisiting this issue, we examine the basis for the intermediate appellate court’s ruling in S.F. v. M.D., and this Court’s rationale in rejecting that ruling in Janice M. To determine whether one is a de facto parent, the Court of Special Appeals adopted a four-part test first articulated by the Wisconsin Supreme Court in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995):
In determining whether one is a de facto parent, we employ the test enunciated in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419 (1995), and V.C. v. M.J.B., 163 N.J. 200, 748 A.2d 539 (2000). Under that test, “the legal parent must consent to and foster the relationship between the third party and the child; the third party must have lived with the child; the third party must perform parental functions for the child to a significant degree; and most *62 important, a parent-child bond must be forged.” V.C., 163 N.J. at 223, 748 A.2d 539.
Id. at 111, 751 A.2d 9.[5] Certiorari was not requested in S.F. v. M.D.
But what exactly is de facto parenthood? The Court in Janice M. explained that the phrase “de facto parent” is “used generally to describe a party who claims custody or visitation rights based upon the party’s relationship, in fact, with a non-biological, non-adopted child.” 404 Md. at 680-81, 948 A.2d 73.[6] In that case, two women, Janice and Margaret, were involved in a same-sex relationship for approximately 18 years, but were not married.[7] Id. at 665, 948 A.2d 73. After Janice’s attempts to become pregnant by use of in vitro fertilization failed, Janice, but not Margaret, adopted a child. Id. A few years after the adoption, the couple separated. Id. After they separated, Margaret filed a complaint in the Circuit Court for Baltimore County seeking custody, or in the alternative, visitation. Id. at 666-67, 948 A.2d 73.
*63 Relying on S.F. v. M.D., the Circuit Court concluded that Margaret was entitled to visitation because she was a de facto parent and that a de facto parent is not required to show unfitness of the biological parent or exceptional circumstances. Id. at 668-69, 948 A.2d 73. The Court of Special Appeals affirmed. See Janice M. v. Margaret K., 171 Md.App. 528, 910 A.2d 1145 (2006). Certiorari was granted, and this Court overruled the intermediate court’s eight-year-old decision in S.F., holding defacto parent status was not a recognized legal status in Maryland. Janice M., 404 Md. at 685, 948 A.2d 73. In rejecting the S.F. holding, the Court refused to distinguish de facto parents from other third parties and asserted that de facto parents seeking access rights must first show parental unfitness or exceptional circumstances before a trial court can apply the best interests of the child standard:
We will not recognize de facto parent status, as set forth in S.F., as a legal status in Maryland. We refuse to do so because, even assuming arguendo that we were to recognize such a status, short-circuiting the requirement to show unfitness or exceptional circumstances is contrary to Maryland jurisprudence, as articulated in McDermott and Koshko.
Even were we to recognize some form of de facto parenthood, the real question in the case sub judice will remain, whether, in a custody or visitation dispute, a third party, nonbiological, non-adoptive parent, who satisfies the test necessary to show de facto parenthood should be treated differently from other third parties. We have not been persuaded that they should be. In other words, where visitation or custody is sought over the objection of the parent, before the best interest of the child test comes into play, the defacto parent must establish that the legal parent is either unfit or that exceptional circumstances exist. A fair reading of McDermott and Koshko leads to no other conclusion.
Id. Accordingly, the Court found that the trial court erred in granting Margaret visitation based on her status as the child’s *64 de facto parent without first determining whether Janice was unfit or whether exceptional circumstances existed to overcome Janice’s “liberty interest in the care, custody, and control of her child.” Id. at 695, 948 A.2d 73. The Court then remanded the case so that the trial court could determine whether exceptional circumstances existed. Id. at 695-96, 948 A.2d 73. In doing so, we explained that “a finding that one meets the requirements that would give that person de facto parent status, were that status to be recognized, is a strong factor to be considered in assessing whether exceptional circumstances exist[,]” but would not be “determinative as a matter of law.” Id. at 695, 948 A.2d 73.
The Court’s decision in Janice M. was not unanimous. In a dissenting opinion, Judge Irma Raker asserted “that a defacto parent is different from ‘third parties’ and should be treated as the equivalent of a legal parent, with the same rights and obligations.” Id. at 696, 948 A.2d 73 (Raker, J., dissenting). The dissent contended that it “would hold that a de facto parent stands in legal parity with a legal parent, whether biological, adoptive, or otherwise, for the purposes of visitation” and “would not apply the threshold determinations of parental unfitness or exceptional circumstances.” Id. at 709, 948 A.2d 73.
Stare Decisis
Stare decisis is the bedrock of our legal system because “it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.” Livesay v. Balt. Cnty., 384 Md. 1, 14, 862 A.2d 33 (2004) (quoting Payne v. Tennessee, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)). Stare decisis, however, must sometimes yield to another judicial duty:
[The common law] may be changed by legislative act as Art. 5 of the Declaration of Rights expressly provides .... It may also be changed by judicial decision _ ‘We have frequently held that it is our duty to determine the common *65 law as it exists in this State .... ’ The doctrine of stare decisis does not preclude the exercise of this duty.
Boblitz v. Boblitz, 296 Md. 242, 274, 462 A.2d 506 (1983), modified by Bozman v. Bozman, 376 Md. 461, 830 A.2d 450 (2003).[8] In the course of abrogating the doctrine of interspousal immunity in tort claims, the Boblitz Court stated:
We are persuaded that the reasons asserted for its retention do not survive careful scrutiny. They furnish no reasonable basis for denial of recovery for tortious personal injury. We find no subsisting public policy that justifies retention of a judicially created immunity that would bar recovery for injured victims in such cases as the present.
Id. at 273, 462 A.2d 506. We further explained in Boblitz:
‘[W]e have never construed [the doctrine of stare decisis] to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people.’
Id. at 274, 462 A.2d 506 (quoting Harrison v. Montgomery Cnty., 295 Md. 442, 459, 456 A.2d 894 (1983)).[9] We have also considered Supreme Court analysis of stare decisis:
The Supreme Court has stated that ‘it is common wisdom that the rule of stare decisis is not an ‘inexorable command,’ *66 and certainly it is not such in every constitutional case.’ Planned Parenthood v. Casey, 505 U.S. 833, 854, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992).
Stare decisis is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process_Nevertheless, when governing decisions are unworkable or are badly reasoned, this Court has never felt constrained to follow precedent. Stare decisis is not an inexorable command; rather, it is a principle of policy and not a mechanical formula of adherence to the latest decision. [Citations omitted] [Internal quotation omitted.] Payne v. Tennessee, 501 U.S. 808, 827-28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991).
Bozman, 376 Md. at 493-94, 830 A.2d 450 (quoting Perry v. State, 357 Md. 37, 96-100, 741 A.2d 1162 (1999)) (emphasis added).
In short, we have recognized two circumstances for departing from stare decisis: (1) when the prior decision is “clearly wrong and contrary to established principles” or (2) when “the precedent has been superseded by significant changes in the law or facts.” DRD Pool Serv., Inc. v. Freed, 416 Md. 46, 64, 5 A.3d 45 (2010) (citations and internal quotation marks omitted).[10] As explained below, we depart from Janice M. on both grounds.

*67
Grounds for Decision in Janice M.

The Janice M. Court relied heavily on McDermott and Koshko to support its rejection .of de facto parenthood and determination that persons meeting this status must nonetheless show parental unfitness or exceptional circumstances before a trial court can apply the best interests of the child standard. See Janice M., 404 Md. at 685-86, 948 A.2d 73 (“Clearly, in light of McDermott and Koshko, S.F. no longer reflects Maryland law, and accordingly, is overruled.”).
As Judge Raker pointed out in her dissenting opinion, McDermott and Koshko “dealt with the rights of pure third parties, and not those of de facto parents.” Id. at 705-06, 948 A.2d 73 (Raker, J. dissenting). In McDermott, which involved maternal grandparents seeking custody in litigation against the child’s father, the Court distinguished “pure third parties” from those persons who are in a parental role. 385 Md. at 356, 869 A.2d 751. Specifically, the court differentiated “pure third parties” from psychological parents. Id.[11] The Court defined the phrase “psychological parents” as “third parties who have, in effect, become parents.” Id. The term “psychological parent” is closely related to the '“de facto parent” label in that these designations are used to describe persons who have *68 assumed a parental role.[12]
The Court then made clear that McDermott was a “pure third-party case” before it proceeded to analyze other pure third-party cases. 385 Md. at 356-57, 869 A.2d 751 (“[I]n comparison with the total number of cases in which attempts are made to utilize the ‘best interest’ standard ... the number of pure third-party cases, such as the present case, is relatively small. It is on these remaining cases throughout the country, that we primarily focus our attention.”) (emphasis added).[13]
Likewise, Koshko involved grandparents seeking visitation, who did not claim to be defacto parents. The Court in Koshko *69 simply extended our holding in McDermott—that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations—to visitation disputes. 398 Md. at 443, 921 A.2d 171 (“Now that we conclusively have stated in McDermott that parental unfitness and exceptional circumstances shall be threshold considerations in third party custody determinations, it is appropriate that we now also apply those considerations in third party visitation disputes.”); see Janice M., 404 Md. at 680, 948 A.2d 73 (“McDermott made clear that parental unfitness and exceptional circumstances are threshold considerations in third party custody determinations; Koshko made clear that those considerations apply in third party visitation disputes.”). But neither McDermott nor Koshko justified this Court’s decision in Janice M. What the Court failed to identify was any rationale for eliminating consideration of the parent-like relationship that the plaintiff sought to protect. It seemingly ignored the bond that the child develops with a de facto parent.

Troxel v. Granville

The Janice M. Court relied in part on the United States Supreme Court’s decision in Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), indicating that it also undermined the intermediate appellate court’s decision in S.F. See 404 Md. at 672-74, 683, 948 A.2d 73 (“[T]he Court of Special Appeals has considered the concept, as well as the status, of a defacto parent in the context of visitation rights in the case of S.F. .... It did so, however, prior to the Supreme Court’s decision in Troxel, and our decisions in McDermott and Koshko.”). In Troxel, the U.S. Supreme Court addressed an appeal from a petition to obtain visitation rights filed by the grandparents of two minor children pursuant to a Washington State visitation statute. The Washington statute provided that “[a]ny person may petition the court for visitation rights at any time, including, but not limited to, custody proceedings. The court may order visitation rights for any person when visitation may serve the best interest of the child *70 whether or not there has been any change of circumstances.” Troxel, 530 U.S. at 61, 120 S.Ct. 2054 (citing Wash. Rev. Code § 26.10.160(3) (1994)). In a fractured opinion, a four-justice plurality held the Washington statute unconstitutional as applied to the facts of the case. Id. at 73, 120 S.Ct. 2054. The high court determined that the state trial court’s visitation order in favor of the grandparents was an unconstitutional infringement on the parent’s “fundamental right to make decisions concerning the care, custody, and control” of her children under the Fourteenth Amendment’s Due Process Clause. Id. at 72, 120 S.Ct. 2054.
Troxel was an extremely narrow decision. See Hernandez v. Hernandez, 151 Idaho 882, 265 P.3d 495, 498 (2011) (describing Troxel’s import as “limited” and “standing] for the narrow proposition that Wash. Rev. Code § 26.10.160(3) (1994) is constitutionally infirm as applied in that case”); see also Jeff H. Pham, Comment, Does Mother Still Know Best?: In Re Marriage of Harris and Its Impact on the Rights of Custodial Parents, 38 Loy. L.A. L. Rev. 1871, 1878 (2005) (characterizing Troxel as a “deliberately narrow opinion”).[14] The Court’s holding hinged “on the sweeping breadth” of the Washington statute and “the application of that broad, unlimited power.” Troxel, 530 U.S. at 73, 120 S.Ct. 2054.[15] Writing on behalf of the plurality, Justice O’Connor expressly declined to address whether substantive due process requires a showing of harm before non-parental visitation is ordered and asserted that “[w]e do not, and need not, define today the precise scope of the parental due process right in the visitation context.” Id. Additionally, it bears mention that the Supreme Court did not *71 strike down the Washington statute as unconstitutional on its face, but only as applied. The Court further maintained that it “would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter.” Id. (stating that “the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied”).
As many courts immediately recognized, Troxel did not denote the end of third party visitation. See, e.g., Jackson v. Tangreen, 199 Ariz. 306, 18 P.3d 100, 103-04 (Ct.App.2000) (holding Arizona grandparent visitation statute constitutional and concluding that Troxel “has no impact” on the state statute); Rideout v. Riendeau, 761 A.2d 291, 303 (Me.2000) (ruling-Maine’s Grandparents Visitation Act, as applied, did not violate the Due Process Clause of the Fourteenth Amendment); Hertz v. Hertz, 291 A.D.2d 91, 738 N.Y.S.2d 62, 64-65 (N.Y.App.Div.2002) (reversing trial court’s judgment that New York’s grandparent visitation statute was unconstitutional and asserting that “Troxel does not mandate a finding that [grandparent visitation statute] is unconstitutional per se”).
Indeed, several state courts of last resort have expressly held that Troxel does not prevent the recognition of de facto parent status. For example, in In re Parentage of L.B., the Washington Supreme Court adopted the concept of de facto parentage and rejected a biological mother’s contention that granting a putative de facto parent standing to seek custody of a minor child would infringe on the biological mother’s fundamental parental interests under Troxel. 155 Wash.2d 679, 122 P.3d 161, 178-79 (2005) (“Finding no constitutional infirmities in recognizing de facto parents”). Similarly, in upholding the constitutionality of a state statute permitting a defacto parent to seek custody, the Delaware Supreme Court explained:
Troxel does not control these facts. The issue here is not whether the Family Court has infringed Smith’s fundamental parental right to control who has access to ANS [the minor child] by awarding Guest co-equal parental status. Rather, the issue is whether Guest is a legal “parent” of ANS who would also have parental rights to ANS—rights *72 that are co-equal to Smith’s. This is not a case, like Troxel, where a third party having no claim to a parent-child relationship (e.g., the child’s grandparents) seeks visitation rights. Guest is not “any third party.” Rather, she is a [ ] de facto parent who ... would also be a legal “parent” of ANS. Because Guest, as a legal parent, would have a coequal “fundamental parental interest” in raising ANS, allowing Guest to pursue that interest through a legally-recognized channel cannot unconstitutionally infringe Smith’s due process rights. In short, Smith’s due process claim fails for lack of a valid premise.
Smith v. Guest, 16 A.3d 920, 931 (Del.2011) (involving lesbian couple and dispute over access to Smith’s adopted child) (emphasis added) (footnotes omitted).[16]
In her Janice M. dissent, Judge Raker rightly emphasized that courts “have continued to recognize the de facto parenthood concept post-Troxel.” 404 Md. at 701-03, 948 A.2d 73 (Raker, J., dissenting). Put simply, numerous courts have declined to treat Troxel as a bar to recognizing de facto parenthood or other designations used to describe third parties who have assumed a parental role. See, e.g., Bethany v. Jones, 2011 Ark. 67, 378 S.W.3d 731, 737 (2011) (“We reiterate that the focus should be on what, if any, bond has formed between the child and the nonparent.”); Marquez v. Caudill, 376 S.C. 229, 656 S.E.2d 737, 743 (2008) (“Because Stepfather is [child’s] psychological parent and is, in fact, the only father he has ever known, we find the family court appropriately determined that it was in [child’s] best interest for Stepfather to have custody of him”); In re Guardianship of Victoria R., 145 N.M. 500, 201 P.3d 169, 177 (Ct.App.2008) (“[W]e hold that *73 a showing that the [ ] petitioners have assumed the role of the psychological parents of the child who is the subject of the [ ] proceeding to the extent that the child will suffer a ‘significant degree of depression’ if the relationship with the psychological parents is abruptly terminated is sufficient to rebut the presumption that the biological parent is acting in the child’s best interests”); Mason v. Dwinnell, 190 N.C.App. 209, 660 S.E.2d 58, 65, 70 (2008) (concluding that former domestic partner of natural parent had standing to bring an action for custody of child where couple “entered into an agreement in which they each acknowledged that [former partner] was a de facto parent and had ‘formed a psychological parenting relationship with the parties’ child’ ”); In re Clifford K., 217 W.Va. 625, 619 S.E.2d 138, 144, 159 (2005) (holding that surviving lesbian partner had standing as a “psychological parent” to seek custody of child she had helped raise with her late partner); C.E.W. v. D.E.W., 845 A.2d 1146, 1150-51 (Me.2004) (reaffirming that courts may “entertain an award of parental rights and responsibilities to a de facto parent”); In re E.L.M.C., 100 P.3d 546, 554 (Colo.App.2004) (former partner of lesbian mother was a “psychological parent” with standing to seek custody); T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913, 917-19 (2001) (lesbian former partner of a child’s biological mother could seek partial custody and visitation based on her standing in loco parentis to the child); Rubano v. DiCenzo, 759 A.2d 959, 975 (R.I.2000) (“[A] person who has no biological connection to a child but who has served as a psychological or de facto parent to that child may ... establish his or her entitlement to parental rights vis-a-vis the child”).
Indeed, no case has interpreted Troxel as inconsistent with parental status for nonbiological parents except Maryland. Treatment by these other courts helps to demonstrate the error made by the Janice M. Court in reasoning that Troxel undermined S.F. and the recognition of de facto parenthood.

The Wisconsin Rule—In re Custody of H.S.H.-K.

Before Janice M., the intermediate appellate court’s recognition of de facto status in S.F. was consistent with *74 McDermott, Koshko, and Troxel because the test it used to determine de facto parenthood was narrowly tailored to avoid infringing upon the parental autonomy of a legal parent. The Court of Special Appeals borrowed a four-factor test enunciated by the Wisconsin Supreme Court in its seminal decision in H.S.H.-K., 533 N.W.2d at 421.[17] Under this test, a third-party seeking defacto parent status bears the burden of proving the following when petitioning for access to a minor child:
(1) that the biological or adoptive parent consented to, and fostered, the petitioner’s formation and establishment of a parent-like relationship with the child;
(2) that the petitioner and the child lived together in the same household;
(3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child’s care, education and development, including contributing towards the child’s support, without expectation of financial compensation; and
(4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.
H.S.H.-K., 533 N.W.2d at 435-36. As other courts adopting this test have recognized, these factors set forth a high bar for establishing de facto parent status, which cannot be achieved without knowing participation by the biological parent. See, e.g., V.C., 748 A.2d at 551-53 (“Prong one is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent’s relationship with the child.”); Rubano, 759 A.2d at 974 (“[These] criteria preclude such potential third-party parents as mere neighbors, earetak- *75 ers, baby sitters, nannies, au pairs, nonparental relatives, and family friends from satisfying these standards.”); E.L.M.C., 100 P.3d at 560 (“These four factors ensure that a nonparent’s eligibility for psychological parent treatment with respect to an unrelated child will be strictly limited.”). Under this strict test, a concern that recognition of de facto parenthood would interfere with the relationship between legal parents and their children is largely eliminated. We thus adopt the multi-part test first articulated by the Wisconsin Supreme Court in H.S.H.-K.[18]
The de facto parent doctrine does not contravene the principle that legal parents have a fundamental right to direct and govern the care, custody, and control of their children because a legal parent does not have a right to voluntarily cultivate their child’s parental-type relationship with a third party and then seek to extinguish it. As the South Carolina Supreme Court explained in Marquez, 656 S.E.2d at 744:
[T]he first factor [in the H.S.H.-K test] is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent’s relationship with the child. This factor recognizes that when a legal parent invites a third party into a child’s life, and that invitation alters a child’s life by essentially providing him with another parent, the legal parent’s rights to unilaterally sever that relationship are necessarily reduced.
See also T.B., 786 A.2d at 919 (“The Superior Court aptly noted, under similar circumstances, that a biological parent’s rights ‘do not extend to erasing a relationship between her partner and her child which she voluntarily created and actively fostered simply because after the parties’ separation she regretted having done so.’ ”). The H.S.H.-K. standard for determining de facto parenthood is therefore consistent with *76 the Supreme Court’s reaffirmation in Troxel, 530 U.S. at 66, 120 S.Ct. 2054, of “the fundamental right of parents to make decisions concerning the care, custody, and control of their children,” as well as with McDermott and Koshko. It is also consistent with an earlier, most pertinent decision by this Court—Monroe v. Monroe, 329 Md. 758, 621 A.2d 898 (1993).

Monroe v. Monroe

In Monroe a putative father sought custody of a child as a third party before learning from blood tests that he was not the biological father of the child. 329 Md. at 760-63, 621 A.2d 898. In discussing whether exceptional circumstances existed to rebut the presumption that the child’s best interests were served by remaining with her biological mother, we concluded that “[w]hat is important, rather, is the relationship that exists between the child and each of the parties.” Id. at 775, 621 A.2d 898. We further asserted that protection of a child’s relationship with a non-biological parent is justified “when the relationship is developed in the context of a family unit and is fostered, facilitated and, for most of the child’s life, encouraged by the biological parent.” Id.; cf. Marquez, 656 S.E.2d at 744 (“[T]he first factor [in the H.S.H.K. test] is critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent’s relationship with the child.”).
Although the Court in Monroe was evaluating whether exceptional circumstances existed, the reasoning of Monroe is equally apposite to de facto parenthood. In the words of the Monroe Court:
Whether the child has established a relationship with a third party sufficient to constitute exceptional circumstances, rebutting the presumption of custody in the biological parent, is not dependent on its development during the absence of the biological parent. A relationship resulting in bonding and psychological dependence upon a person without biological connection can develop during an ongoing biological parent/child relationship. Particularly is this true when the relationship is developed in the context of a family unit and *77 is fostered, facilitated and, for most of the child’s life, encouraged by the biological parent.
Monroe, 329 Md. at 775, 621 A.2d 898.
Our previous recognition of the importance—for legal purposes—of a psychological bond between a child and non-parent confirms the notion that de facto parenthood is distinct from pure third party status. Id.; see also McDermott, 385 Md. at 356, 869 A.2d 751 (distinguishing “pure third parties” from “psychological parents”). The Monroe Court’s emphasis on bonding and psychological dependence reflects the longstanding judicial recognition in Maryland (and elsewhere) that children need good relationships with parental figures and they need them to be stable. The Janice M. Court’s rejection of de facto parent as a status sufficient for standing in child access cases contravenes this universally accepted concept. For these reasons, the first ground for overruling Janice M. is satisfied—the precedent was “clearly wrong and contrary to established principles.” DRD Pool Serv., 416 Md. at 64, 5 A.3d 45.

Janice M. Has Been Undermined By Subsequent Events

The anemic grounds for the Janice M. decision are not the only reason we recognize the doctrine of de facto parenthood. Additionally, the passage of time and evolving events have rendered Janice M. obsolete—the second circumstance recognized in DRD Pool Serv. and other cases. Maryland’s recognition of same-sex marriage in 2012—Civil Marriage Protection Act, Ch. 2, 2012 Md. Laws 9—undermines the precedential value of Janice M. Our state’s recognition of same-sex marriage illustrates the greater acceptance of gays and lesbians in the family unit in society. See also Melina Constantine Bell, Gender Essentialism and American Law: Why and How to Sever the Connection, 23 Duke J. Gender L. & Pol’y 163, 200 (2016) (“[G]ay men and lesbians, and same-sex couples are gaining greater acceptance in the U.S.”); Elizabeth S. Scott & Robert E. Scott, From Contract to Status: Collaboration and the Evolution of Novel Family Relationships, 115 Colum. L. *78 Rev. 293, 374 (2015) (reviewing the “dramatic change in public attitudes ... for same-sex couples who wish to marry”).
But gays and lesbians are particularly “ill-served by rigid definitions of parenthood.” Nancy D. Polikoff, This Child Does Have Two Mothers: Redefining Parenthood to Meet the Needs of Children in Lesbian-Mother and Other Nontraditional Families, 78 Geo. L.J. 459, 464 (1990).[19] As Polikoff explained, when gay or lesbian relationships end, at least one member “will find itself in a court system ill-prepared to recognize its existence and to formulate rules to resolve its disputes. ... [t]he contestants stand as a parent and a nonparent, a legal status inconsistent with their functional status.” See id. at 463. Thus, the General Assembly’s according greater rights to same-sex couples when it recognized same-sex marriage in 2012 further undermines the value of adhering to Janice M., a precedent which can be considered “archaic” because it fails to effectively address problems typical of divorce by same-sex married couples. See State v. Waine, 444 Md. 692, 700, 122 A.3d 294 (2015) (“We may decline to follow the doctrine when persuaded the prior decision is clearly wrong, or when the precedent has been rendered archaic and inapplicable to modern society through the passage of time and evolving events.”) (citation and internal quotation marks omitted). The same problems exist even when an unmarried same-sex couple separates.[20]
In addition, a majority of states, either by judicial decision or statute, now recognize de facto parent status or a similar concept. See Nancy D. Polikoff, From Third Parties to Parents: The Case of Lesbian Couples and Their Children, 77 *79 Law & Contemp. Probs. 195, 208 (2014) (“A minority of states ... have denied a functional psychological parent without legal status the ability to request custody or visitation rights.”); see also Katharine T. Bartlett, Prioritizing Past Caretaking in Child-Custody Decisionmaking, 77 Law & Contemp. Probs. 29, 66 (2014) (observing that most jurisdictions that “have directly confronted the matter recognize de facto parenthood in certain limited circumstances” and counting Maryland among the few jurisdictions that “appear to remain committed to doctrines denying custodial responsibilities altogether to third parties who have engaged in day-to-day, residential caretaking in a parenting capacity”).
Indeed, the Washington Supreme Court identified a “modern common law trend of recognizing the status of de facto parents” as early as 2005. Parentage of L.B., 122 P.3d at 176 n. 24. A diverse array of jurisdictions, from Alaska to West Virginia, constitute this majority. See, e.g., Kinnard v. Kinnard, 43 P.3d 150, 151, 153-55 (Alaska 2002) (affirming shared-custody award to father and stepmother, who was the child’s psychological parent); E.N.O. v. L.M.M., 429 Mass. 824, 711 N.E.2d 886, 888, 891-93 (1999) (adopting de facto parenthood and affirming judgment granting temporary visitation to lesbian former partner of biological mother); Parentage of L.B., 122 P.3d at 177 (“[Hjenceforth in Washington, a defacto parent stands in legal parity with an otherwise legal parent, whether biological, adoptive, or otherwise.”); C.E.W., 845 A.2d at 1149 (“We have recognized de facto parental rights or similar concepts in addressing rights of third persons who have played an unusual and significant parent-like role in a child’s life ....”); T.B., 786 A.2d at 917, 920 (rejecting biological mother’s argument that “the well-established doctrine of in loco parentis should be abandoned” and concluding that “the lower courts properly found that [lesbian former partner] stood in loco parentis to [child] and therefore had standing to seek partial custody for purposes of visitation”); Boseman v. Jarrell, 364 N.C. 537, 704 S.E.2d 494, 504-05 (2010) (affirming that non-biologieal parent could be granted custody rights “because [biological mother] acted inconsistently with her *80 paramount parental status”); Rubano, 759 A.2d at 976 (“[T]he fact that [biological mother] not only gave birth to this child but also nurtured him from infancy does not mean that she can arbitrarily terminate [lesbian former partner’s] de facto parental relationship with the boy, a relationship that [biological mother] agreed to and fostered for many years.”); V.C., 748 A.2d at 550 (concluding former lesbian partner of biological mother had standing to seek joint custody and visitation); Marquez, 656 S.E.2d at 745 (stepfather was the psychological parent of his non-biological child and it was in child’s best interest for stepfather to have custody of him); E.L.M.C., 100 P.3d at 553-54 (former partner of lesbian mother was a “psychological parent” with standing to seek custody; “inherent in the bond between child and psychological parent is the risk of emotional harm to the child should that relationship be significantly curtailed or terminated”); Latham v. Schwerdtfeger, 282 Neb. 121, 802 N.W.2d 66, 75 (2011) (“The district court erred when it concluded that the doctrine of in loco parentis did not apply to this case. The undisputed facts show that [lesbian former partner] has rights which are entitled to consideration and has standing based on the doctrine of in loco parentis.”); In re Jonathan G., 198 W.Va. 716, 482 S.E.2d 893, 913 (1996) (“[W]e hold that a child has a right to continued association with individuals with whom he has formed a close emotional bond, including foster parents, provided that a determination is made that such continued contact is in the best interests of the child.”); Bethany, 378 S.W.3d at 738 (“Having determined that Jones [biological mother’s former same-sex partner] stood in loco parentis, the question then becomes whether it is in [the child’s] best interest for Jones to have visitation rights, as that is the polestar consideration.”). In some states, legislation was enacted authorizing standing for a de facto parent to sue for either custody or visitation.[21]
*81 Additionally, family law scholarship and the academic literature have also endorsed the notion that a functional relationship—as well as biology or legal status—can be used to define parenthood.
The American Law Institute (“ALI”) has recommended expanding the definition of parenthood to include de facto parents and includes a de facto parent as one of the parties with standing to bring an action for the determination of custody, subject to the best interests of the child analysis. ALI, Principles of the Law of Family Dissolution: Analysis and Recommendations §§ 2.03, 2.04 (2003) (adopted May 16, 2000).[22] Additionally, many commentators have espoused the concept of de facto parenthood in examining the inadequacies of recognizing only legal parenthood. Emily R. Lipps, Note, Janice M. v. Margaret K.: Eliminating Same-Sex Parents’ Rights to Raise Their Children by Eliminating the De Facto Parent Doctrine, 68 Md. L. Rev. 691 (2009) (criticizing Janice M. and arguing that Court should have recognized de facto parent status); Sacha M. Coupet, “Ain’t I a Parent?”: The Exclusion of Kinship Caregivers from the Debate over Expan *82 sions of Parenthood, 34 N.Y.U. Rev. L. & Soc. Change 595, 653 (2010) (“[D]e facto parental status holds tremendous promise as an avenue for kinship caregivers seeking parental recognition.”); Dorothy R. Fait, Jillian L. DiLaura & Michelle M. Botek, Who Is A Parent?, 42 Md. B.J. 4, 10 (2009) (“The natural parent should not be permitted to use the ‘fundamental right to parent’ as a shield once the ‘de facto parent’ relationship is no longer convenient. In certain cases, the best interests of the child can only be protected through the legal acceptance of the de facto parent .... ”).
In short, Janice M. now deviates sharply from the decisional and statutory law of other jurisdictions. The weight of authority outside Maryland reinforces our decision to overturn Janice M. and recognize defacto parenthood.
Maryland Statutory Law
Importantly, Maryland statutory law is silent when it comes to defacto parenthood. At oral argument, Brittany maintained that we should not overrule Janice M. because defacto parent status should be left to the General Assembly. We disagree. The General Assembly has granted equity courts jurisdiction over the “custody or guardianship of a child.” Md. Code (1984, 2012 Repl. Vol.), Family Law (“FL”) Article § l-201(b)(5). As part of their broad power to fashion appropriate relief, equity courts have “plenary authority to determine questions concerning the welfare of children.” Stancill v. Stancill, 286 Md. 530, 534, 408 A.2d 1030 (1979). “In other words, a court of chancery stands as a guardian of all children and may interfere at any time and in any way to protect and advance their welfare and interests.” Ross v. Hoffman, 280 Md. 172, 176, 372 A.2d 582 (1977).
Other jurisdictions in recognizing de facto status have also cast aside the contention that recognition of such status should be left to the legislative branch where the relevant statutes were silent on de facto parenthood. In Parentage of L.B., 122 P.3d at 176, the Washington Supreme Court wrote:
Our state’s current statutory scheme reflects the unsurprising fact that statutes often fail to contemplate all potential *83 scenarios which may arise in the ever changing and evolving notion of familial relations. Yet, simply because a statute fails to speak to a specific situation should not, and does not in our common law system, operate to preclude the availability of potential redress. This is especially true when the rights and interests of those least able to speak for themselves are concerned. We cannot read the legislature’s pronouncements on this subject to preclude any potential redress to [minor child] or [putative de facto parent]. In fact, to do so would be antagonistic to the clear legislative intent that permeates this field of law—to effectuate the best interests of the child in the face of differing notions of family and to provide certain and needed economical and psychological support and nurturing to the children of our state.
Id. (emphasis added). This reasoning is in accord with other state high courts that have recognized de facto parenthood. See, e.g., H.S.H.-K., 533 N.W.2d at 424-25 (“Nor did the legislature intend the [] visitation statute to supplant or preempt the courts’ long standing equitable power to protect the best interest of a child by ordering visitation in circumstances not included in the statute.... [t]he legislature did not intend to [] ‘occupy the field’ of visitation.”); E.N.O., 711 N.E.2d at 890 (“The court’s duty as parens patriae necessitates that its equitable powers extend to protecting the best interests of children in actions before the court, even if the Legislature has not determined what the best interests require in a particular situation.”).
Although several state courts have refused to adopt defacto parent status on the grounds that such decisions should be left to the legislature,[23] we find this reasoning inapt because *84 Maryland’s statutory scheme in the area of family law is not as comprehensive as such states. Indeed, Maryland statutory law on child custody and visitation illustrates that “statutes often fail to contemplate all potential scenarios which may arise in the ever changing and evolving notion of familial relations.” Parentage of L.B., 122 P.3d at 176.
Maryland does not have statutory factors for courts to consider in determining whether a party’s access to a child is in that child’s best interests. See FL §§ 9-101-9-108; see also Linda D. Elrod & Robert G. Spector, A Review of the Year in Family Law 2011-2012: “DOMA” Challenges Hit Federal Courts and Abduction Cases Increase, 46 Fam. L.Q. 471, 524-27 (2013) (indicating that Maryland is only one of eleven states not to have statutory factors).[24] Rather than looking to codified rules, the factors courts consider in making a “best interests determination” are found in case law. Taylor v. Taylor, 306 Md. 290, 303-312, 508 A.2d 964 (1986). This judicially determined law has been in place for many years, without legislation overruling it. See Montgomery Cnty. v. Robinson, 435 Md. 62, 78, 76 A.3d 1159 (2013) (“It is a settled principle of Maryland law that the General Assembly is presumed to be aware of legislation it has enacted as well as the interpretation the courts have given that legislation.”) (internal citations omitted). Thus, we discern no evidence that Maryland’s General Assembly intended to preempt common law jurisprudence over the “ever changing and evolving notion of familial relations” in child custody proceedings.
For these reasons, we reject Brittany’s contention that an equity court’s ability to consider de facto parent status in *85 fashioning relief pertaining to the custody or guardianship of a child lies solely within the province of the General Assembly.[25]
Conclusion
We overrule Janice M. because it is “clearly wrong” and has been undermined by the passage of time. In light of our differentiation in McDermott, 385 Md. at 356, 869 A.2d 751, between “pure third parties” and those persons who are in a parental role, we now make explicit that de facto parents are distinct from other third parties. We hold that defacto parents have standing to contest custody or visitation and need not show parental unfitness or exceptional circumstances before a trial court can apply a best interests of the child analysis. The best interests of the child standard has been “firmly entrenched in Maryland and is deemed to be of transcendent importance.” Ross, 280 Md. at 174-75, 372 A.2d 582. With this holding we fortify the best interests standard by allowing judicial consideration of the benefits a child gains when there is consistency in the child’s close, nurturing relationships.
We do so carefully, adopting the multi-part test first articulated by the Wisconsin Supreme Court in H.S.H.-K. This test accommodates, we think, the dissonance between what is in the best interest of a child and a parent’s right to direct and govern the care, custody, and control of their children.
We reverse the Court of Special Appeals, and direct that court to remand this case to the Circuit Court for determination of whether, applying the H.S.H.-K. standards, Michelle should be considered a de facto parent, and conduct further proceedings consistent with this opinion.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS *86 CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENT.
Battaglia, Greene and Watts, JJ., concur

. In her brief, Michelle notes that she is now a ‘'transgender man” and states that the record does not reflect her gender identity because she transitioned to living as a man after the contested divorce hearing occurred. She further explained that she would refer to herself using female pronouns and her former name for consistency with the record and that her gender identity is not material to any legal issue in this appeal. For consistency with the record, we too shall refer to Michelle using female pronouns and her former name.

. Md. Code (1974, 2011 Repl. Vol.), Estates & Trusts Article ("ET”), § l-208(b) provides:
A child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his father only if the father:
(1) Has been judicially determined to be the father in an action brought under the statutes relating to paternity proceedings;
(2) Has acknowledged himself, in writing, to be the father;
(3) Has openly and notoriously recognized the child to be his child; or
(4) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.
(Emphasis added.) ET § l-208(a) states that "[a] child born to parents who have not participated in a marriage ceremony with each other shall be considered to be the child of his mother.”

. Michelle testified that the purpose of the document was to facilitate decision-making for Jaxon if Brittany were hospitalized. Brittany testified that she signed the document under duress.

. In her brief, Michelle notes that we must reach the issue of de facto parentage even if the Court rules in her favor regarding the statutory parentage presumption under ET § l-208(b). She explains that should the Court rule in her favor on ET § l-208(b), it will be possible on remand for the Circuit Court to allow Brittany to rebut her presumptive parentage. Michelle, however, does not argue that we must reach any of the issues pertaining to ET § l-208(b) should we rule in her favor on de facto parenthood.

. In a decision affirming visitation for a biological mother's same-sex former domestic partner, the New Jersey Supreme Court described the four-part test enunciated in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995) as ”[t]he most thoughtful and inclusive definition of de facto parenthood.” V.C. v. M.J.B., 163 N.J. 200, 748 A.2d 539, 551 (2000).

. The American Law Institute ("ALI”) defines a de facto parent as:
[A]n individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years,
(i) lived with the child and,
(ii) for reasons primarily other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions,
(A) regularly performed a majority of the caretaking functions for the child, or
(B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived.
American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 2.03(I)(c) (2003) (adopted May 16, 2000).

. Same-sex marriages were not authorized under Maryland law at that time. See Conaway v. Deane, 401 Md. 219, 932 A.2d 571 (2007).

. The Court in Boblitz v. Boblitz, 296 Md. 242, 462 A.2d 506 (1983), abolished spousal immunity only for negligence actions. In Bozman v. Bozman, 376 Md. 461, 497, 830 A.2d 450 (2003), we modified Boblitz by expanding the variety of torts for which one spouse could sue another: “Joining the many of our sister States that have already done so, we abrogate the interspousal immunity rule, a vestige of the past, whose time has come and gone, as to all cases alleging an intentional tort.”

. Unger v. State, 427 Md. 383, 417, 48 A.3d 242 (2012) identified various cases in which we overruled our prior decisions:
This Court has not hesitated to overrule prior decisions which are clearly wrong. See, e.g., Cure v. State, 421 Md. 300, 320-322, 26 A.3d 899, 910-911 (2011) (The Court, in an opinion by Judge Harrell, overruled a prior decision of this court concerning waiver and adopted the position of the three dissenters in that prior case); Harris *66 v. Board of Education, 375 Md. 21, 59, 825 A.2d 365, 388 (2003) (Overruling three prior cases and their progeny on the ground that the overruled cases had erroneously inserted in the Workers Compensation Act an additional requirement not included by the Legislature); State v. Kanaras, 357 Md. 170, 184, 742 A.2d 508, 516 (1999) (Overrules five prior decisions which had misinterpreted the Postcon-viction Procedure Act); Owens-Illinois v. Zenobia, 325 Md. 420, 470-471, 601 A.2d 633 (1992) (The Court overruled several cases relating to punitive damages on the ground that the "holdings were erroneous and were inconsistent with [prior] Maryland ... law”); Townsend v. Beth.-Fair. Shipyard, 186 Md. 406, 417, 47 A.2d 365, 370 (1946).

. This ground is also described as "when the precedent has been rendered archaic and inapplicable to modern society through the pas *67 sage of time and evolving events.” State v. Stachowski, 440 Md. 504, 520, 103 A.3d 618 (2014) (internal citations omitted).

. Although the Court used the term "physiological parents,” it is clear that this was a typographical error. McDermott v. Dougherty, 385 Md. 320, 356, 869 A.2d 751 (2005) ("Some states have conceptualized the idea of physiological parents, third parties who have, in effect, become parents and thus, the case is considered according to the standards that apply between natural parents.”) (emphasis added). In the very same paragraph, the Court used the phrase "psychological parent.” Id. ("In that situation there are no constitutional rights involved (although in some cases constitutional claims are made using terms such as ‘psychological parent’ and the like) and the 'best interest’ standard is generally applied.”) (emphasis added). In addition, in its later discussion of other jurisdictions, the McDermott Court also used the phrase “psychological parents.” Finally, a Westlaw search for "physiological parents,” "physiological parent,” and "physiological parenthood" yielded no cases other than McDermott.

. Compare Janice M. v. Margaret K., 404 Md. 661, 681 n. 8, 948 A.2d 73 (2008) ("The term ‘psychological parent' is based primarily in social science theory, and refers to a party who has a ‘parent-like’ relationship with a child as a result of ‘day-to-day interaction, companionship, and shared experiences,’ ”) (quoting Joseph Goldstein, Anna Freud & Albert J. Solnit, Beyond the Best Interests of the Child 19 (1973)), with id. at 680, 948 A.2d 73 (stating that “ ‘parent in fact' ” is the “literal meaning’’ of de facto parent). These terms are so similar that courts often use them interchangeably. See, e.g., V.C., 748 A.2d at 546 n. 3 (noting that "[t]he terms psychological parent, de facto parent, and functional parent” would be "used interchangeably in this opinion to reflect their [similar] use in the various cases, statutes, and articles cited”); see generally In re Parentage of L.B., 155 Wash.2d 679, 122 P.3d 161, 167 n. 7 (2005) (explaining the meaning of "the related yet distinct terms of in loco parentis, psychological parent, and de facto parent”). As one commentator put it, the psychological parent and de facto parent "doctrines are often used interchangeably, and the nuances between them vary by jurisdiction, but the same basic principles underlie their application.” Lindsy J. Rohlf, Note, The Psychological-Parent and De Facto-Parent Doctrines: How Should the Uniform Parentage Act Define "Parent”?, 94 Iowa L. Rev. 691, 700 (2009) (describing the differences between the two doctrines as "superficial”), Indeed, the Court in Janice M. acknowledged the similarity of these terms. 404 Md. at 681 n. 8, 948 A.2d 73 (“While these designations [de facto parent, in loco parentis and psychological parent] are related, they are not always, or necessarily, identical in meaning.”).

. The Court also examined cases in which a state was involved in the custody process, but did not consider these to be "pure third-party” cases. See McDermott, 385 Md. at 365, 869 A.2d 751 (citing Connecticut Supreme Court decision and observing it was "not a pure third-party case in that the state was the petitioning party”).

. Even the Koshko Court acknowledged the narrowness of Troxel v. Granville, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). See Koshko v. Haining, 398 Md. 404, 443, 921 A.2d 171 (2007) ("We are aware that the plurality opinion in Troxel does not compel our holding in this regard in the present case.”).

. See Jeff Atkinson, Shifts in the Law Regarding the Rights of Third Parties to Seek Visitation and Custody of Children, 47 Fam. L.Q. 1, 4 (2013) ("The Washington state statute under which visitation had been granted in Troxel was one of the broadest in the country.”).

. In SooHoo v. Johnson, 731 N.W.2d 815 (Minn.2007), the Minnesota Supreme Court upheld a provision of the state's third party visitation statute granting de facto parents visitation. In finding the provision not unconstitutional, the court noted that the fundamental right of parents to the care, custody, and control of their children is not absolute and cited the United States Supreme Court's recognition "that states may intrude on parental rights in order to protect the ‘general interest in the youth's well being.’ " 731 N.W.2d at 822 (citing Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944)).

. The Wisconsin Supreme Court in In re Custody of H.S.H.-K., 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995), "was one of the first states to adopt equity principles to protect a functional parent-child relationship." Danaya C. Wright, Inheritance Equity: Reforming the Inheritance Penalties Facing Children in Nontraditional Families, 25 Cornell J.L. & Pub. Pol’y 1, 15 (2015).

. In deciding whether to award visitation or custody to a de facto parent, the equity court should also take into account whether there are other persons who have already been judicially recognized as de facto parents. A court should be very cautious and avoid having a child or family to be overburdened or fractured by multiple persons seeking access.

. See also Patricia M. Logue, The Rights of Lesbian and Gay Parents and Their Children, 18 J. Am. Acad. Matrimonial Law. 95, 115 (2002) ("Many lesbian and gay people are having and parenting children with a partner. If the relationship ends by death or separation, the parent-child relationships of nonbiological de facto parents may be cast into legal limbo,”).

. Of course, persons ending a heterosexual marriage or other relationship may also achieve standing if they meet the criteria set forth in H.S.H.-K., 533 N.W.2d at 421, which we have adopted herein.

. See D.C. Code § 16-831.03(a) (West, Westlaw through May 11, 2016) ("A de facto parent may file a complaint for custody of a child or a motion to intervene in any existing action involving custody of the child.''); Del. Code Ann. tit. 13, § 8-201(c) (West, Westlaw through 80 Laws 2016) ("De facto parent status is established if the Family Court *81 determines that the de facto parent _”); Or. Rev. Stat. Ann. § 109.119 (West, Westlaw through 2016 Reg. Sess.) ("Except as otherwise provided in subsection (9) of this section, any person, including but not limited to a related or nonrelated foster parent, stepparent, grandparent or relative by blood or marriage, who has established emotional ties creating a child-parent relationship or an ongoing personal relationship with a child may petition or file a motion for intervention with the court having jurisdiction over the custody, placement or guardianship of that child _”); Tex. Fam. Code Ann. § 102.003(a)(9) (West, Westlaw through 2015 Reg. Sess.) ("An original suit may be filed at any time by a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition.”).

. Pamela Laufer-Ukeles, Money, Caregiving, and Kinship: Should Paid Caregivers Be Allowed to Obtain De Facto Parental Status?, 74 Mo. L. Rev. 25, 29 (2009) ("In the last two decades, a trend has developed in state law and in scholarly commentaiy toward increasing openness to awarding parenting rights to third parties who have been functional caregivers to children, precipitating the adoption of de facto parenthood and parenthood by estoppel status in the ALI Principles.”).

. See, e.g., Smith v. Gordon, 968 A.2d 1 (Del.2009); Jones v. Barlow, 154 P.3d 808 (Utah 2007); Moreau v. Sylvester, 196 Vt. 183, 95 A.3d 416 (2014). For instance, before Delaware’s General Assembly recognized de facto parenthood by statute, Del. Code Ann. tit. 13, § 8-201(c), the Delaware Supreme Court refused to adopt de facto parent status because the state legislature "enact[ed] a comprehensive statutory scheme *84 that reflected] a public policy unambiguously to define the parent-child relationship as a legal relationship.” Smith v. Gordon, 968 A.2d at 15.

. It should be noted that the General Assembly has provided some legislative direction in custody proceedings. Under Md. Code (1984, 2012 Repl. Vol.), Fam, Law Article § 9-101, a court must determine if it has "reasonable grounds to believe" that a child has been abused or neglected by a party seeking custody and if so, the court must make a finding that there is no further likelihood of abuse or neglect if unsupervised custody or access is to be awarded to that person.

. The General Assembly has the power, of course, to enact a differing standard than the one we now restore.