*Katelyn McMorrow v. Vernon King, III*, No. 875, September Term, 2024. Opinion by Hotten, J.

**CIVIL PROCEDURE – RES JUDICATA – EFFECT OF DEFENDANT'S POST-JUDGMENT OBJECTION TO ADOPTION**

Where a plaintiff brings a constitutional claim attacking a defendant's status as a de facto parent, that claim is barred by res judicata when the plaintiff has previously litigated the constitutionality of the status to a final judgment on the merits. The fact that the defendant exercises his de facto parent rights in a different way following the judgment does not open his de facto parent status to another constitutional attack by the same plaintiff.

**FAMILY LAW – CHILD SUPPORT – DE FACTO PARENTHOOD – OBLIGATION OF DE FACTO PARENT TO SUPPORT CHILD**

Where a de facto parent takes affirmative steps to obtain parental rights equal to those of a biological parent, and actually asserts those rights against the biological parent, the de facto parent must share in the statutory obligation to support the child.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 875

September Term, 2024

_____

KATELYN MCMORROW

v.

VERNON KING, III

_____

Nazarian,
Leahy,
Hotten, Michele D.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Hotten, J.

_____

Filed: March 5, 2025

*Zic, Terrence, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal involves the grant of a motion to dismiss, as well as custody and child support rulings by the Circuit Court for Washington County. Appellee Vernon King, III ("Grandfather"), and his now-deceased wife Jeanette King sued Appellant Katelyn McMorrow ("Mother") in the Circuit Court for Montgomery County in 2018 for custody of, or in the alternative, for visitation with Mother's minor child, asserting de facto parent status. The Circuit Court for Montgomery County found that Grandfather and Ms. King were de facto parents of the minor child and awarded them liberal visitation. Mother did not seek appellate review of that ruling.

In 2022, Mother sued Grandfather and Ms. King in the Circuit Court for Washington County to terminate their de facto parent rights. The Circuit Court for Washington County dismissed this complaint. Mother did not seek appellate review of that ruling. Then, in 2023, Mother filed another complaint against Grandfather in the Circuit Court for Washington County, this time seeking to terminate Grandfather's de facto parent rights, or alternatively, for modification of custody and for child support. The court dismissed Mother's request to terminate de facto parent rights on res judicata grounds, ordered a slight modification of custody, and denied Mother's request for child support.

On appeal, Mother presents three questions for our review:

1. Was Mother's request to terminate de facto parent rights barred by the doctrine of res judicata?
2. Is the continuing award of de facto parent rights to Grandfather a violation of Mother's constitutional rights as the biological parent of the minor child?
3. Did the Court err in failing to order Grandfather as de facto parent to pay Mother child support?

In a cross-appeal, Grandfather presents a fourth question for our review:

4. Did the trial court commit error by failing to perform the required statutory analysis under Md. Code Ann., FL § 12-103 when denying Grandfather's request for attorney's fees?

For the reasons outlined below, we conclude that the circuit court correctly dismissed Mother's constitutional claims on res judicata grounds and properly denied Grandfather's request for attorney's fees, despite not assessing either party's financial status or needs. However, we also conclude that the circuit court erred in denying Mother's request for child support. Therefore, we shall affirm, in part, and reverse, in part, the judgment of the circuit court and remand for further proceedings consistent with this opinion.

## BACKGROUND

Mother met Troy King ("Father") in 2010 when they were nineteen and eighteen years old, respectively. At the time, Mother was enrolled at Salisbury University, and Father was studying at the University of Tennessee. An intimate relationship ensued during which Mother became pregnant with the minor child. That summer, before Mother and Father returned to their respective colleges, Father's parents held a meeting at their home to discuss where and with whom the minor child would live while Mother and Father attended college. In attendance at the meeting were Mother and Father, the minor child's paternal grandparents, Jeanette King and Grandfather (collectively "the paternal grandparents"), the minor child's maternal grandmother, and Mother's stepfather. At this meeting it was decided that the paternal grandparents would raise and care for the minor child while Mother and Father were in college.

2

The minor child was born on February 10, 2011, and as agreed, she lived with the paternal grandparents. For the first seven and a half years of her life, the paternal grandparents were the minor child's primary caregivers in all respects, including love, affection, nurturing, feeding, bathing, housing, clothing, academic training, guidance, religious upbringing, and health care decisions. Mother remained involved in the minor child's life during this time, albeit to a limited degree. Although not explicitly stated, the minor child's extended stay with her paternal grandparents was likely motivated, at least in part, by Father's death on August 17, 2013, due to an apparent heroin overdose.

In the Spring of 2017, Mother asked for the first time that the minor child transition to live primarily with her. In September 2017, Mother moved into a home with Steve Kocevar ("Mr. Kocevar"), her boyfriend at the time. In November 2017, Mother and Mr. Kocevar met with the paternal grandparents to discuss the minor child's transition into Mother's care. The parties agreed that the minor child would transition into Mother's care after she finished first grade in June 2018, but the paternal grandparents would have liberal access to the minor child, including on weekends, for overnight and midweek visits, for holidays, for school and extracurricular events, and during the summer. The minor child's transition to Mother's care occurred on August 26, 2018.

Not long after the minor child's transition into Mother's care, the relationship between Mother and the paternal grandparents became strained. On December 3, 2018, Mother canceled access "until further notice," citing concerns that the minor child's paternal uncle, Kyle King ("Uncle"), may have interacted with the minor child against Mother's wishes. Uncle is Father's brother and the son of the paternal grandparents. Uncle

3

is a Tier III registered sex offender for life, having been convicted of sexual abuse of his minor child. Uncle also has an alleged history of erratic behavior, including walking on Rockville Pike with a loaded firearm, claiming that his children are spies against him, and getting into altercations with past employers who he believed were conspiring against him. Uncle allegedly possesses a wide array of weapons, including guns, bows, knives, and axes that he keeps in his home on Grandfather's property.

On December 7, 2018, just four days after Mother canceled access to the minor child, the paternal grandparents filed a Verified Complaint for Custody, or in the Alternative, for Visitation. In their complaint, the paternal grandparents alleged that they are de facto parents of the minor child and requested shared physical and legal custody. After applying the four-factor test for determining de facto parent status announced by the Supreme Court of Maryland in *Conover v. Conover*, 450 Md. 51 (2016), the Circuit Court for Montgomery County held that the paternal grandparents satisfied the test, qualified as the minor child's de facto parents, and had standing to contest custody without having to prove the existence of exceptional circumstances or that Mother is an unfit parent. Having concluded that the paternal grandparents are the minor child's de facto parents, the Circuit Court for Montgomery County proceeded to apply the best interest factors. In an order dated December 12, 2019, the court ultimately granted Mother primary physical and sole legal custody of the minor child, but awarded liberal visitation to the paternal grandparents. Mother did not appeal this ruling.

There were no significant developments in the case for a couple years, aside from the fact that Mother married Mr. Kocevar on July 4, 2020. Then, on May 20, 2022,

4

approximately two and a half years after the 2019 Custody and Access Order, Mother filed a Complaint for Custody and to Terminate "De Facto Parent Rights" (the "2022 Complaint") in the Circuit Court for Washington County (the "circuit court"). In the 2022 Complaint, Mother requested that the court terminate the paternal grandparents' de facto parent status, arguing that their de facto parent status had limited her constitutional right to direct the upbringing of the minor child. In May 2022, the paternal grandmother passed away, leaving Grandfather as the remaining de facto parent. In a Motion to Dismiss, Grandfather defended on the ground of res judicata, arguing that Mother was attempting to impermissibly relitigate Grandfather's de facto parent status. The court summarily dismissed the 2022 Complaint in an order dated August 12, 2022.

While the 2022 Complaint was still pending, Mr. Kocevar initiated proceedings to adopt the minor child in July 2022. Following dismissal of the 2022 Complaint, Grandfather filed an objection to the adoption petition on September 23, 2022. This objection prevented Mr. Kocevar from adopting the minor child due to costs associated with litigating a contested adoption.

On February 23, 2023, Mother once again sued Grandfather to terminate his de facto parent status (the "2023 Complaint"), forming the basis of the dispute presently before this Court. As alternative relief in the 2023 Complaint, Mother also asked for a modification of custody and for child support. Mother alleges that the main difference between this complaint and the 2022 Complaint is Grandfather's objection to Mr. Kocevar's adoption petition.

On August 10, 2023, the circuit court dismissed Mother's requests to declare de facto parenthood unconstitutional and terminate Grandfather's de facto parent status, reasoning that these claims were barred by res judicata. However, the circuit court declined to dismiss Mother's claims for a modification of custody and child support, instead setting those issues in for a hearing on February 14, 2024.

Following hearings on February 14, 2024, and May 16, 2024, the circuit court issued an order, dated June 4, 2024, in which the court maintained primary physical and sole legal custody of the minor child with Mother, made some minor adjustments to Grandfather's access rights, and denied Mother's request for child support.

Mother filed a timely notice of appeal with this Court on July 1, 2024.

**STANDARD OF REVIEW**

We review de novo the grant of a motion to dismiss. *D.L. v. Sheppard Pratt Health Sys., Inc.*, 465 Md. 339, 350 (2019). When considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them. *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643 (2010). The court should order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, i.e., the allegations do not state a cause of action for which relief may be granted. *Id.*

"Ordinarily, child support orders are within the sound discretion of the trial court." *Reichert v. Hornbeck*, 210 Md. App. 282, 316 (2013) (citing *Walker v. Grow*, 170 Md.

6

App. 255, 266 (2006)). "Nonetheless, 'where the order involves an interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review.'" *Id.* (quoting *Walker*, 170 Md. App. at 266) (cleaned up).

Like child support orders, "[d]ecisions concerning the award of counsel fees rest solely in the discretion of the trial judge." *Petrini v. Petrini*, 336 Md. 453, 468 (1994). Thus, "[a]n award of attorney's fees will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong." *Id.* However, "[c]onsideration of the statutory criteria is mandatory in making the award and failure to do so constitutes legal error." *Id.*

## DISCUSSION

### I. Mother's Attempt to Relitigate Grandfather's De Facto Parent Status is Barred by Res Judicata

Mother argues that the circuit court erred when it dismissed, on res judicata grounds, her request to terminate Grandfather's de facto parent status. She contends that her request to terminate Grandfather's de facto parent status is not barred by res judicata because there has been a change in circumstances affecting the minor child's welfare since the order dismissing the 2022 Complaint. Specifically, Mother points to Grandfather's objection to Mr. Kocevar's adoption petition as a new basis on which she seeks termination of Grandfather's de facto parent rights.

As a preliminary matter, Grandfather objects to Mother's inclusion of the Objection to Adoption in her Record Extract, and her reference to it in her opening brief, because the

7

Objection to Adoption was never made part of the record in this case. Furthermore, Grandfather argues that his status as de facto parent has been settled since the 2018 litigation, and that Mother lost her right to challenge this status when she failed to timely appeal the decision of the Circuit Court for Montgomery County. He also argues that Mother's as-applied challenge to the constitutionality of de facto parenthood, on the basis of Grandfather's objection to Mr. Kocevar's adoption petition, is also barred by res judicata because that issue was raised in the 2022 litigation, and Mother did not timely appeal the Circuit Court for Washington County's decision in that case.

> Res judicata, also known as claim preclusion, is a legal doctrine that
>
> bars the relitigation of a claim if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation.

*R & D 2001 v. Rice*, 402 Md. 648, 663 (2008) (cleaned up). Three elements must be satisfied for a claim to be barred by res judicata:

> (1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.

*Id.*

The doctrine of res judicata does not bar *all* re-litigation. Instead, it "extends 'only to the facts and conditions as they existed at the time of the first judgment and does not bar the fresh litigation of an issue which is appropriately subject to periodic redetermination, as *subsequent facts and changed conditions* may alter the status of the thing being

8

evaluated.'" *Scott v. Prince George's Cnty. Dep't of Soc. Servs.*, 76 Md. App. 357, 376 (1988) (quoting *Towers v. Dir., Patuxent Inst.*, 18 Md. App. 248, 250 (1973)). That is why, although custody and visitation orders entered by the court are intended to provide some measure of finality, courts will entertain motions to modify custody and visitation if a party can show a material change in circumstances affecting the best interest of the child. *Barrett v. Ayres*, 186 Md. App. 1, 18 (2009).

Here, Mother argues that her request for termination of Grandfather's de facto parent rights is not barred by res judicata, because as long as there are new facts and circumstances introduced at the second action which could not have been introduced at the first, res judicata poses no barrier to a second action to terminate parental rights. *See Scott*, 76 Md. App. at 379. However, Mother did not allege in her complaint any abuse or neglect of the minor child, any recent criminal convictions incurred by Grandfather, or any of the other statutorily defined bases for termination. *See* Md. Code Ann., Fam. Law ("FL") § 5-323(d). Rather, the only new fact or circumstance Mother points to is Grandfather's objection to Mr. Kocevar's adoption petition.

Mother claims that Grandfather's ability to use his de facto parent status to block Mr. Kocevar from adopting the minor child is a new circumstance that unconstitutionally interferes with her right as a parent to make decisions for the minor child. However, neither Grandfather's de facto parent status, nor its effect on Mr. Kocevar's ability to adopt the minor child, are new issues. Mother could have, and should have, raised her facial challenge to the constitutionality of Grandfather's de facto parent status during the 2018 litigation, but did not do so. When she did raise a constitutional challenge to Grandfather's

de facto parent status in the 2022 litigation, that challenge was dismissed and was not appealed. In both cases, the judgments of the circuit courts became final when Mother failed to appeal within thirty days. *See Lovero v. Da Silva*, 200 Md. App. 433, 441-42 (2011) (discussing effect of failure to file within the 30-day deadline). Thus, her claim in this case, that Grandfather's de facto parent status unconstitutionally interferes with her rights as a parent, is barred by res judicata.

### A. Mother's Failure to Appeal the 2019 Decision Rendered the Court's Determination of De Facto Parent Status Final

In her complaint, Mother argued that de facto parenthood is both facially unconstitutional and unconstitutional as applied. When making a facial challenge, a party asserts that a law or policy is invalid on its face and could never be found to be valid. *Thornton Mellon LLC v. Frederick Cnty. Sheriff*, 479 Md. 474, 512 (2022). Thus, for a facial challenge, the particular circumstances of the case do not matter, because the party seeking to invalidate the law must prove that it is unconstitutional in *all* circumstances. Even if we were to concede that the case at bar presents a new, unforeseen circumstance that could not have been previously litigated, Mother's facial challenge to Grandfather's de facto parent status would still be barred by res judicata.

In their 2018 Complaint, the paternal grandparents asserted standing to seek custody of or visitation with the minor child on the ground that they were de facto parents of the minor child. In its 2019 Order, the Circuit Court for Montgomery County agreed, holding that the paternal grandparents are the minor child's de facto parents and awarding them visitation rights with the minor child. If Mother believed then, as she asserts now, that the

10

court's decision unconstitutionally infringed on her rights as a parent, she should have appealed that decision to this Court. However, Mother did not appeal that decision within thirty days, so the judgment became final, and all future facial challenges to Grandfather's de facto parent status, including this one, were barred by res judicata.

### B. Grandfather's Objection to the Minor Child's Adoption does not Harm Mother in a Way that Could Not Have Been Raised and Determined in the Prior Litigation

In addition to her facial challenge, Mother also brought an as-applied challenge to the constitutionality of de facto parenthood. By bringing an as-applied challenge, a party contends that a law or policy has an unconstitutional effect on the party. *Thornton Mellon LLC*, 479 Md. at 512. Thus, if the law affects a party in a new or unexpected way that could not have been previously litigated, a new as-applied challenge to the law will not be barred by res judicata. Importantly, though, the doctrine of res judicata bars not only those claims that were actually litigated, but also those claims which *could have* or *should have* been raised in the previous litigation. *R & D 2001*, 402 Md. at 663.

Under Maryland Rule 9-107, "[a]ny person having a right to participate in a proceeding for adoption or guardianship may file a notice of objection to the adoption or guardianship." Md. Rule 9-107. The class of persons having a right to participate in a proceeding for adoption or guardianship is "strictly limited to those with legal rights at stake." *In re Malichi W.*, 209 Md. App. 84, 92 (2012) (quoting 2 Am. Jur. 2d Adoptions (2004) at § 121). A finding of de facto parent status comes with a basket of legal rights, including the right to contest custody and visitation. *See Conover*, 450 Md. at 85 ("We hold that *de facto* parents have standing to contest custody or visitation[.]"); *David A. v. Karen*

11

*S.*, 242 Md. App. 1, 27 (2019) ("*De facto* parent status effectively elevates a third party to equal footing with biological parents for the purpose of determinations of custody and visitation[.]"). Since the Circuit Court for Montgomery County found that Grandfather was a de facto parent, he has legal rights at stake in any potential adoption proceeding for the minor child. Thus, the right to object to the minor child's adoption is necessarily included within the panoply of rights afforded to him as a de facto parent.

Mother argues that by exercising his right to object to Mr. Kocevar's adoption petition, Grandfather invaded her constitutional rights as a parent in a way that is different from his alleged invasion of those rights in 2018 when he sought custody or visitation with the minor child. This argument is not persuasive.

Under Mother's argument, we would have to accept that Grandfather caused her harm in 2019 when he used his de facto parent status to secure visitation with the minor child, and that when he objected to the minor child's adoption in 2022, he caused Mother a new, distinct harm. But the two alleged harms are not distinct from one another. Rather, both alleged harms stem from Mother's belief that Grandfather's de facto parent status unconstitutionally infringes on her rights as a parent. The fact that Grandfather exercised his de facto parent rights in 2022 in a way that is different from the way he exercised his rights in 2018 does not result in a new harm. Both are part of one continuing harm that Mother alleges has existed since Grandfather secured de facto parent status, and its accompanying rights, in 2019. Mother had an opportunity to contest the circuit court's adverse ruling on appeal in 2019, but did not do so, and that judgment became final. Mother again had an opportunity to challenge the circuit court's adverse ruling in 2022, but did

12

not, and that judgment became final. Mother should not get a third bite at the apple in this case. Her constitutional claims regarding de facto parenthood are barred by res judicata.

## II. The Constitutionality of De Facto Parenthood is Not Properly Before this Court, and Even if it Were, this Court Cannot Grant Mother the Relief She Seeks

Mother argues that de facto parenthood, established in this State by the Supreme Court of Maryland in *Conover*, is unconstitutional, both on its face and as applied here. Grandfather, on the other hand, argues that the constitutionality of de facto parenthood is well-settled in Maryland since the Supreme Court of Maryland's decision in *Conover*. He points to *Caldwell v. Sutton*, 256 Md. App. 230 (2022), where this Court held that when a parent allows a person to "develop a parent-like relationship with a child, 'the legal parent's rights to unilaterally sever that relationship are necessarily reduced.'" 256 Md. App. at 267 (quoting *Conover*, 450 Md. at 75). Since the test to establish de facto parenthood requires the knowing participation of the legal parent in fostering a parent-like relationship, Grandfather contends that de facto parenthood does not infringe upon the legal parent's constitutional rights.

A relatively recent concept in Maryland, de facto parenthood is a means by which a third party may have standing to contest custody and visitation of a minor child without having to prove exceptional circumstances or unfitness of the legal parent. *Conover*, 450 Md. at 85. Generally, a third party, like a grandparent, must prove exceptional circumstances or unfitness of the legal parent before a court can even consider a custody or visitation award. *Id.* at 61. However, under *Conover*, a third party who meets the requirements of de facto parenthood has standing, equal to that of a legal parent, to seek

13

custody or visitation, and can bypass the hurdles that a third party would normally have to jump over. *Id.* at 85.

The Court in *Conover* adopted a four-factor test, established by the Wisconsin Supreme Court in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis. 1995), under which a third-party seeking de facto parent status must establish the following when petitioning for access to a minor child:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

450 Md. at 74.

The Court "adopted the *H.S.H.-K.* test, in part, because it is 'narrowly tailored to avoid infringing upon'" the fundamental constitutional rights of parents. *Basciano v. Foster*, 256 Md. App. 107, 145 (2022) (quoting *Conover*, 450 Md. at 74). Specifically, the Court highlighted the first factor—the consent prong—as being "critical because it makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child." *Conover*, 450 Md. at 75 (quoting *Marquez v. Caudill*, 656 S.E.2d 737, 744 (S.C. 2008)); *see also Basciano*, 256 Md. App. at 143, 146-47 (holding

that, where a child was placed in the care of his grandparents due to parental drug use, the first factor of the *H.S.H.-K.* test was not satisfied because neither of the child's legal parents ever consented to the formation of a parent-like relationship between the child and the grandparents); *Caldwell*, 256 Md. App. at 279-80 (holding that the first factor was satisfied where the legal parent signed a form consenting to a grandparent having sole legal and physical custody of her minor child prior to being incarcerated).

Mother now argues that the *H.S.H.-K.* test is overbroad and unconstitutionally infringes upon her parental rights. However, since her claim is barred by res judicata, it is not properly before this Court, and we decline to consider it. Additionally, even if Mother's constitutional claim was properly before this Court, we could not grant the relief she seeks.

When it adopted the concept of de facto parenthood in *Conover*, the Supreme Court of Maryland addressed arguments like Mother's regarding the constitutionality of such status. The Court found that de facto parenthood is consistent with "the fundamental right of parents to make decisions concerning the care, custody, and control of their children," because under the first factor of the *H.S.H.-K.* test, it is the biological or adoptive parent's *decision* to foster a parent-like relationship which leads to the creation of de facto parent status. *Conover*, 450 Md. at 75-76 (quoting *Troxel v. Granville*, 530 U.S. 57, 66 (2000)). Absent "knowing participation by the biological parent," a de facto parent relationship cannot be formed. *Id.* at 74.

Despite this, Mother insists that the test adopted for determining de facto parent status is unconstitutional. She requests that this Court overturn the test adopted in *Conover* and replace it with a stricter test established in the 2017 Uniform Parentage Act ("UPA").

15

The UPA test includes two significant departures from the standard set forth in *H.S.H.-K.* First, instead of requiring that a prospective de facto parent take "significant responsibility for the child's care" as is in the current test, the UPA test requires them to undertake "full and permanent responsibilities of a parent of the child." Second, the UPA test also requires that the prospective de facto parent hold the child out as their child.

"This Court is 'bound by the [Supreme Court of Maryland] precedent.'" *Shaarei Tfiloh Congregation v. Mayor and City Council of Balt.*, 237 Md. App. 102, 145 (2018) (quoting *Montgomery Cty. Career Fire Fighters Ass'n v. Montgomery Cty.*, 210 Md. App. 200, 230 (2013)); *see also Scarborough v. Altstatt*, 228 Md. App. 560, 577–78 (2016), *cert. denied*, 450 Md. 129 (2016) ("[T]he ruling of the [Supreme Court of Maryland] remains the law of this State until and '[u]nless those decisions are either explained away or overruled by the [Supreme Court of Maryland] itself.'" (citation omitted)). Accordingly, we will not adopt and apply a new standard in contravention of existing Supreme Court of Maryland precedent.

### III. Where a De Facto Parent Asserts Rights to Custody or Visitation with a Minor Child that are Equal to those of a Legal Parent, he or she Carries a Corresponding Obligation to Support the Minor Child that Should be Enforced According to the Best Interest of the Child

Mother argues that de facto parents should be required to pay child support because de facto parents are "placed on equal footing with legal parents regarding custody and visitation rights." Mother contends that if de facto parents have equal rights to custody and visitation, they should also have an equal responsibility to support the child. Mother points to other situations where we have held that a non-biological, non-adoptive parent was

16

required to pay child support, such as in cases of artificial insemination. Mother further argues that the American Law Institute ("ALI") principles support the idea of de facto parent child support.

Grandfather responds that de facto parents should not be obligated to pay child support. Echoing the circuit court, Grandfather argues that the "rights and obligations for a *de facto* parent stem from the relationship between the child and the *de facto* parent when such relationship is consented to and fostered by the natural parent." He contrasts this with the rights and obligations for payment of child support, which he argues "stem from the conscious creation, adoption, and/or birthing of the child." Grandfather distinguishes this case from the artificial insemination cases cited by Mother, arguing that unlike those cases, he never had any choice whether to conceive the child here. Rather, Grandfather contends that he "gratuitously assumed the burdens of custody" and is merely "a grandparent who wants to maintain a relationship with his granddaughter."

De facto parent child support is an issue of first impression for this Court.[1] This Court and the Supreme Court of Maryland have answered other important questions stemming from the Court's decision in *Conover*. For example, in *E.N. v. T.R.*, 474 Md. 346 (2021), the Court clarified that under the first factor of the *H.S.H.-K.* test, both legal parents, if there are more than one, must consent to and foster a parent-like relationship with a third

---

[1] In *Caldwell v. Sutton*, the circuit court ordered the child's grandmother to provide monetary support for the child, despite its finding that she was a mere third party. 256 Md. App. 230, 283 (2022). On appeal, she argued that the circuit court lacked authority to issue such an order. *Id.* Because this Court reversed the circuit court's determination that the grandmother was not a de facto parent, we declined to address the issue of child support. *Id.* at 284. That issue is now squarely before us in this case.

17

party to satisfy the test. 474 Md. at 394-95. And in *Kpetigo v. Kpetigo*, 238 Md. App. 561 (2018), this Court explained that de facto parent status is not limited to divorcing same-sex spouses. 238 Md. App. at 574. This case presents an opportunity for this Court to address another important question stemming from *Conover*: whether de facto parents owe their "de facto children" a legal, statutory obligation of support.

Under § 5-203 of the Family Law Article, "The parents of a minor child . . . are jointly and severally responsible for the child's *support*, care, nurture, welfare, and education." Md. Code Ann., FL § 5-203(b)(1) (emphasis added). The statute does not define "parent," but there is no question that this provision applies to biological or adoptive parents. Whether it also applies to de facto parents, however, is the question presented here.

Few states have considered whether de facto parents may be obligated to pay child support, but one state has specifically addressed the question. In *Pitts v. Moore*, 90 A.3d 1169 (Me. 2014), the Supreme Judicial Court of Maine held that "once the court finds that a party is a de facto parent, that party is a parent for all purposes, and the court must then go on to consider the appropriate award of parental rights and responsibilities—including child support[.]" 90 A.3d at 1182. The court arrived at this conclusion because in Maine, "[a] determination that a person is a de facto parent means that he or she is a parent on *equal footing* with a biological or adoptive parent, that is to say, with the same opportunity for parental rights *and responsibilities*." *Id.* at 1181 (emphasis added). Importantly, the Supreme Judicial Court of Maine made this decision despite the fact that, as in Maryland, Maine's "Legislature has yet to speak about de facto parenthood[.]" *Id.*

18

Grandfather argues that *Pitts* is distinguishable because that case involved an individual who mistakenly believed himself to be the father of a child, but later learned that another person was the child's biological father, while this case involves an individual who gratuitously took on the obligations of parenthood while a natural parent was unavailable. Grandfather's argument is unpersuasive, however. The court in *Pitts* never indicated that its holding hinged on *how* an individual becomes a de facto parent, just that they *are* a de facto parent. Thus, the difference that Grandfather points to between this case and *Pitts* is irrelevant.

De facto parents in Maryland enjoy similar custody and visitation rights as de facto parents in Maine. For example, this Court has held that "[d]*e facto* parent status effectively elevates a third party to *equal footing* with biological parents for the purpose of determinations of custody and visitation[.]" *David A.*, 242 Md. App. at 27 (emphasis added). Additionally, because a de facto parent has equal rights to custody and visitation as a legal parent, a de facto parent also has equal rights to attorney's fees and costs in such proceedings. *Id.* at 28. Thus, de facto parents have the same powers in relation to children as legal parents.

Here, Grandfather attempts to reap the benefits of his de facto parent status without incurring any of the costs. It is clear that in Maryland, biological and adoptive parents have rights to custody and visitation with their children, but also owe their children corresponding duties of support. Grandfather claims that because he is a de facto parent, he can enjoy those same rights of custody and visitation, while simultaneously owing no corresponding duties of support. Such an outcome would be both illogical and inequitable.

19

Therefore, we hold that a de facto parent who asserts his or her rights to custody or visitation owes a corresponding duty to pay child support, subject to a best interest of the child analysis.

The circuit court came to the opposite conclusion. In his remarks from the bench, the trial judge stated, "I do not find it equitable or legal for [Grandfather] to have to pay child support - - u'm - - it's just not the law for *de facto* parenting." In support of its finding, the circuit court provided the following explanation:

> In child support, two people decide - - and I use that term deliberating, and I've used it for years deliberating, they decide to have a child maybe because of promiscuity or maybe it was a more thoughtful decision. But they decide to have a child and those parents made the decision to be responsible for that child. Mr. King did not decide - - uh - - to conceive [the minor child].

The court added:

> Those people being a parent by estoppel or an adoptive parent are parents. They are the legal guardians of the children, they are parents. And they pay child support. U'm - - Mr. King is not in that category.

There is Maryland case law supporting the circuit court's finding that *choice* is determinative of whether one is a parent for purposes of child support. For example, in *Sieglein v. Schmidt*, 224 Md. App. 222 (2015), this Court held that the non-biological, non-adoptive parents of a child, conceived through in vitro fertilization (IVF) via donated egg and sperm during marriage, were the legal parents of that child for purposes of paying child support. 224 Md. App. at 227-28. This Court reasoned that they had a duty to support the child because "Mother and Father, during their marriage, *willingly and voluntarily agreed to conceive* a child through assisted reproductive services using anonymously donated

20

genetic material and that *volitional action* resulted in the birth of a child[.]" *Id.* at 227 (emphasis added).

Courts in other states have also indicated that choice is of paramount concern in determining whether one is a parent for purposes of paying child support. *See, e.g.*, *Elisa B. v. Superior Court*, 117 P.3d 660, 662 (Cal. 2005) (holding that a woman had a legal obligation to support twin children, despite no biological or adoptive relation to the children, because she "agreed to raise [the] children with her lesbian partner, supported her partner's artificial insemination using an anonymous donor, and received the resulting twin children into her home and held them out as her own"); *Matter of Shondel J. v. Mark D.*, 853 N.E.2d 610, 611 (N.Y. 2006) (holding that where a man held himself out as a child's father, but later determined that he was not in fact the child's biological father, the man was still obligated to make child support payments since the child justifiably relied on his representation of paternity by forming a bond with him, to the child's detriment); *L.S.K. v. H.A.N.*, 813 A.2d 872, 877-78 (Pa. Super. Ct. 2002) (holding that a woman, who was neither the biological nor adoptive parent of five children, was still obligated to support them because she and the biological mother agreed to have the children through artificial insemination during their relationship, and she was significantly involved in the children's day-to-day lives for over eight years).

Grandfather contends that the artificial insemination cases are inapplicable since, unlike those cases, he had no choice regarding the conception of the child. Instead, he points to two out-of-state cases where grandparents were deemed to have no child support obligations.

In *S.R.G. v. D.D.G.*, 224 A.3d 368 (Pa. Super. Ct. 2019), a pair of grandparents had legal and primary physical custody of their grandchild due to the unfitness of the child's parents. 224 A.3d at 369. After the grandparents divorced, the grandmother ("S.R.G.") sought child support payments from the grandfather ("D.D.G."). *Id.* at 370. Importantly, the court considered the grandparents to be third parties, not de facto parents. *Id.* Acknowledging that she could not base her claim for child support merely on D.D.G.'s in loco parentis status, S.R.G. instead based her claim on the Pennsylvania Supreme Court's decision in *A.S. v. I.S.*, 130 A.3d 763 (Pa. 2015). In *A.S.*, the court held that where a stepfather had "taken sufficient affirmative steps legally to obtain parental rights[,]" he "should share in parental obligations, such as paying child support." *Id.* at 770-71. Unlike the stepfather in *A.S.*, the court found that D.D.G. could not be obligated to pay child support because "[D.D.G.] has not asserted custody rights against a fit biological parent, but rather another third party." *S.R.G.*, 224 A.3d at 372.

Grandfather in the case at bar is more like the stepfather in *A.S.* than the grandfather in *S.R.G.* Like the stepfather in *A.S.*, Grandfather "haled a fit [biological mother] into court" and "litigat[ed] to achieve the same legal and physical custodial rights as would naturally accrue to any biological parent." *A.S.*, 130 A.3d at 770. Also like the stepfather in *A.S.*, who "asserted [his] parental rights to prevent a competent biological mother from relocating with her children," Grandfather has asserted his de facto parent rights, against Mother's wishes, to prevent the child's adoption by Mr. Kocevar. *Id.* Importantly, the grandparents in *S.R.G.* "never sought court-ordered custody in an effort to assert custodial rights as against either or both parents." 224 A.3d at 371. That is exactly what the

22

grandparents in this case did when they sued for custody of the minor child in 2018. Thus, while Grandfather may have "gratuitously and generously filled the parental void" initially, his actions were no longer gratuitous when he and his wife "affirmatively, assertively, aggressively or otherwise sought out a parental role" by suing for custody in 2018. *Id.* For these reasons, *S.R.G.* does not support Grandfather's contention that he should not be required to pay child support.

Grandfather also cites *In re Marriage of Bergeson-Flanders and Flanders*, 509 P.3d 1083 (Colo. App. 2022), a Colorado case where a biological father sought child support payments from the minor child's maternal grandmother. The child's father in *Flanders*, relying on another Colorado case, *In re Parental Responsibilities Concerning A.C.H.*, 440 P.3d 1266 (Colo. App. 2019), argued that the maternal grandmother, who was allocated parental responsibilities in a dependency and neglect proceeding, should be ordered to pay him child support. *Flanders*, 509 P.3d at 1084. In *A.C.H.*, the Colorado Court of Appeals held that "a psychological parent who fights for and obtains all the same responsibilities of a legal parent" must "also assume the responsibility to pay child support." 440 P.3d at 1271. Among the facts critical to the court's holding were: (1) the stepfather and the child lived together as a family for nearly four years; (2) the stepfather was the only father the child had ever known; (3) even after he and the biological mother broke up, the stepfather continued to exercise equal parenting time with the child for the next six years; and (4) the court ultimately granted him an order for parenting time and decision-making responsibility for the child. *Id.* Unlike *A.C.H.*, the court in *Flanders* held that the maternal grandmother was not obligated to pay child support because "maternal grandmother never

23

sought parental rights, and nothing in the record shows that maternal grandmother fought for permanent custody of the child or did anything more than agree to care for the child[.]" 509 P.3d at 1086.

Here, Grandfather has done far more than merely agree to care for the child. Unlike the maternal grandmother in *Flanders*, Grandfather has affirmatively sought parental rights, including custody of the child. In 2018, he sued for, and won, de facto parent rights, which put him on equal footing with the child's legal parent. The Supreme Court of Maryland has explained that "[t]he term 'psychological parent' is closely related to the '*de facto* parent' label[.]" *Conover*, 450 Md. at 67. Additionally, he asserted his de facto parent rights to prevent Mr. Kocevar from adopting the child. Thus, like the stepfather in *A.C.H.*, Grandfather "[fought] for and obtain[ed] all the same responsibilities of a legal parent" and therefore must "also assume the responsibility to pay child support." 440 P.3d at 1271.

What the circuit court failed to appreciate is that we are here today *precisely* because of the choices that Grandfather has made throughout the history of this case. Grandfather did not choose to conceive the minor child; that choice was made by Mother and Father. Nor has Grandfather ever chosen to hold the minor child out as his own. However, Grandfather did choose to develop a parent-like bond with the minor child for the first seven and a half years of her life. He chose to exercise his de facto parent rights when he sued for custody or visitation of the minor child in the first place. And finally, he chose to exercise his de facto parent rights when he objected to Mr. Kocevar's adoption of the minor child, effectively blocking the adoption from proceeding forward. Grandfather has made plenty of choices throughout the history of this case, and he has reaped great rewards from

24

those choices, including liberal visitation rights with the minor child. But as with any other parent, whether biological or adoptive, a de facto parent who exercises his rights to custody and visitation with a minor child must shoulder a corresponding duty to support that child.

## IV. The Circuit Court Was Not Required to Assess Either Party's Financial Status and Needs Before Denying Grandfather's Request for Attorney's Fees

Grandfather argues that the circuit court erred as a matter of law when it denied his request for attorney's fees because it did not assess either party's financial status and needs. Mother, on the other hand, argues that the circuit court did not err because, in her view, consideration of the statutory criteria is only mandatory when the court actually grants an award of attorney's fees, which was not the case here. Additionally, Mother argues that even if the court did err by failing to assess either party's financial status and needs, such error was harmless.

Fee awards in child custody and support cases are governed by § 12-103 of the Family Law Article. That section states in relevant part:

> **(a)** The court may award to either party the costs and counsel fees that are just and proper under all the circumstances in any case in which a person:
>
> > **(1)** applies for a decree or modification of a decree concerning the custody, support, or visitation of a child of the parties; or
> > **(2)** files any form of proceeding:
> > > **(i)** to recover arrearages of child support;
> > > **(ii)** to enforce a decree of child support; or
> > > **(iii)** to enforce a decree of custody or visitation.
>
> **(b)** Before a court may award costs and counsel fees under this section, the court shall consider:
>
> > **(1)** the financial status of each party;
> > **(2)** the needs of each party; and

25

**(3)** whether there was substantial justification for bringing, maintaining, or defending the proceeding.

Whether to grant an award of attorney's fees is a matter of discretion committed to the sound discretion of the trial court. *David A.*, 242 Md. App. at 23. If, in the exercise of its discretion, the court chooses to *award* attorney's fees, then Section 12-103(b) requires the court to consider three things: (1) the financial status of each party; (2) the needs of each party; and (3) whether each party had a substantial justification for its position in the proceeding. If the court grants an award of attorney's fees without considering all three criteria, it commits legal error. *See Davis v. Petito*, 425 Md. 191, 201 (2012) ("[S]ubstantial justification is but one consideration in the triad, the others being financial status and needs, *to support fee shifting*.") (emphasis added); *Petrini v. Petrini*, 336 Md. 453, 468 (1994) ("Consideration of the statutory criteria is mandatory *in making the award* and failure to do so constitutes legal error.") (emphasis added); *David A.*, 242 Md. App. at 35 (finding that the court's authority "to *award* attorney's fees and costs in a custody, visitation, or child support proceeding" is "subject only to the requirement that the court must first consider" the three mandatory criteria provided by Section 12-103(b)) (cleaned up) (emphasis added). If a court denies a request for attorney's fees, however, that denial will be reviewed only for abuse of discretion.

Here, the circuit court discussed why it believed that Mother had substantial justification for bringing this action, explaining that "these are novel areas of law, and people should be encouraged to pursue novel and unique areas of law." The court also discussed the relative value of the legal services afforded to both parties, explaining that

26

Mother was represented by pro bono counsel, while Grandfather was not. The court then weighed these competing considerations and announced that "not finding any lack of substantial justification, u'm – I have to deny the request for attorney's fees." The court's denial of attorney's fees is reviewed for abuse of discretion. *David A.*, 242 Md. App. at 23. Declining to award Grandfather any attorney's fees in this case was not an abuse of the circuit court's discretion because, as the court pointed out, Mother's complaint in this case raised novel questions about an emerging area of the law in Maryland. Thus, the court's discretion was not exercised arbitrarily, and its decision to deny an award of attorney's fees was not clearly wrong.

In making this determination, the circuit court did not conduct the "systematic review of economic indicators in the assessment of the financial status and needs of the parties" contemplated by Section 12-103. *Davis*, 425 Md. at 206. If the court had granted an award of attorney's fees without completing this mandatory analysis, it would have committed legal error. However, such review is unnecessary when the court denies an award of attorney's fees. Since the court did not award attorney's fees in this case, its failure to consider the financial status and needs of the parties was not error.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY IS AFFIRMED IN PART AND REVERSED IN PART. CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS ARE TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

27